No state more jealously guards the property rights than Texas. But the lower court's opinion inadvertently undermines those protections. A central rule of property law is that an owner's rights do not pass without the owner's consent. That consent is critical. Even fraudulently induced consent passes voidable title. But in this case, there's undeniably been no consent on behalf of the government of Mexico for its property to be lost. There's also no question but that its property rights have been lost. If an owner cannot recover possession of his property, if an owner cannot recover damages for its loss or damage, then the rights that form the bundle of rights that create property is gone. The lower court held there were three reasons that Pemex lost its rights to its connoisseur. The passage of time, because prescriptions had run, because the property had been blended with property of others, and pursuant to Chapter 33 because many individuals and entities had been involved in the transactions where it was stolen, laundered, and resold. The loss of Pemex's rights in this case are particularly important because we're dealing with sovereign property. This case was so important that the Mexican Attorney General issued her official opinion describing Mexico's property as inalienable and imprescriptible. The defendants want to classify that as some sort of super right that should not be respected in this case, but it's the exact same property right claimed by the United States government over its property. Sovereigns do not lose their property through the mere passage of time. I know the Attorney General said that and you had experts, and I know Mexico doesn't have much case law except for the Supreme Court, but is there any case authority to the effect that supports the Attorney General's opinion? I don't know of any case law because there essentially is none in Mexico, but the Constitution itself uses the words inalienable and imprescriptible to describe Mexico's rights in its petroleum, and the opinion of the Mexican Attorney General is binding on this court as stated by the U.S. Supreme Court in United States v. Pink. I thought Pemex was no longer pursuing Mexican law on appeal. We are not pursuing a Mexican law claim. Our claim is for Texas law under conversion. We're limiting our position on this point is that the conversion is a simple tort. It's the unwarranted interference with someone's property rights. The tricky parts of the conversion case is what are the property rights? Mexican law obviously controls the nature of Mexico's property rights in its own property, and since the U.S. government makes the same claims to their property, they would clearly want to have that same respect shown to Mexico. If a U.S. satellite falls in the Mexican desert or property smuggled across the border, they're going to want to have the same protections that are afforded to them here there, which is the same one. Sovereigns do not lose their property rights through the passage of time. But even apart from the sovereign property issue, the district court erred in holding that Mexico lost its property rights, even under Texas law, because it's clear that loss, that the passage of the statute of limitations is a loss of the title and a passage of the title. Therefore, Texas and the common law well before Texas became a state is clear that for property rights to be lost through the passage of time, there must be the elements of adverse possession. That is, the running of prescriptions and adverse possession is one and the same thing. Outside of the many treatises we cite, we cited in the brief Connor v. Hawkins, Texas Supreme Court, 1888, adverse possession of a piano. The court said the statute not only bars the remedy, but vests the right and the property. That court cited an even earlier Texas Supreme Court, Winburn v. Cochran, 9 Texas 125. There is no Southwest site. 1852. Excuse me, Your Honor. No, I was just thinking the limitation period is a procedural thing. Don't we apply Texas law in deciding the limitations period? Unless the right is coupled with a prescription period, which in this case we've argued that the Mexican law, because the property itself is the right and the property is imprescriptial, that that passes. And those cases are cited in the brief. In this regard, what I'm saying is that even if you do apply Texas law, as stated by the Texas Supreme Court in 1852, when Texas was a mere seven years old, we didn't put this in the brief because it's a somewhat off-putting case because it deals with the property in question as a slave, and it reads horribly. But in terms of the limitations ruling, the Texas Supreme Court stated, in suits to recover personal property, the statute of limitations and the principle of adverse possession are inseparably connected. They continued, the statute does not begin to run until the possession becomes adverse. This is a critical case because the entire position of the district court and of the defendants is that there's no discovery rule, it's a strict statute of limitations because after the cases in Computer Associates, Texas won't recognize a delaying of the accrual of a cause of action unless the Texas Supreme Court has stated that. Well, they have. They did in 1886. They did in 1888, and they've done it ever since. Every state in the Union and in England has said property is not lost because of the passage of limitations unless the holding is adverse possession. It has to be adverse, hostile, and most importantly, public. The defendants' only response to this argument in our brief, well, they make two. One, it's a new argument and it's waived, which is not true. It's almost embarrassing how verbatim this argument in our brief is from the position we presented to the lower court. Every authority in our brief was presented to the lower court. Their second argument is to cite to their Mexican legal expert and describe that there's some sort of difference in two natures of prescription. But even that explanation does not set forth that there's a difference between the accrual of the statute for one versus the other. In this case, for hundreds of years, the rule has been limitations accrues on a case for possession of property or damage to property only when that possession is hostile and public. Defendants do not deny that their possession fails to meet that requirement. In any event, the district court never reached that issue and it's a fact question. The district court's rule creates a real problem if it's applied. What if this was not oil, it was art? You can find a number of lists, including Wikipedia, of the major works of stolen art that are out there. Not one of those pieces of art was stolen in the last two years. The Isabella Stewart Garden Museum was robbed in 1990 for dozens of valuable pieces, a $300 million Rembrandt. There's still a $5 million reward for the return of that Rembrandt. There's no need because if the rule is set out in the district court, all they need to do is bring that art to Texas, keep it in a warehouse for two years, and they can sell it. It would not matter that it was stolen in a foreign country. It would not matter if it was property of a foreign sovereign. If it's brought here, it's a strict two-year statute and you lose. Notably, when New York considered adopting a discovery rule in comparison to their demand rule, Governor Cuomo stated that he'd been advised by the U.S. State Department that the proposed change would cause New York to become a haven for cultural property stolen abroad. Even a discovery rule was not enough protection for adverse possession. The new rule set out in the district court's case is far more damaging. Any lawyer in the world who had a client with art of questionable provenance would have to advise their client, take the art to Texas, hold it for two years. Is there a distinction between art and fungible commodities? There are in other areas, but not for this. We have the right under Texas law to ask for a recovery of our condensate. It's not the same condensate. It has to be of the like kind. But there's never been a case that applies the property rules differently because it's fungible good. In fact, the court said, well, I don't look at fungible good. The district court, we argued fungible good, and the next issue I'm going to talk about, which is the blending. But whether it's, I mean, the statute either runs or it doesn't, and the limitations period has never been divided on the nature of the property that's being assessed apart from real versus personal property. As to the blending argument, the law has been the same, again, for hundreds of years, that when fungible goods are mixed, original owners own a share in proportion to their contribution. Intermedial cotton cases, umbel oil from the Texas Supreme Court, and UCC 7207, which says, if different lots of fungible goods are commingled, the goods are owned in common by the person entitled thereto. When Pemex's crude was mixed, it became an owner of its percentage of the combined mass. The UCC treatises, we cite, say very clearly, the owner of a combined can only pass as much title as he has. So when Superior bought 100 barrels of stolen crude and 100 barrels of good crude and mixed them together, they only owned half. They could only sell half. And when Shell bought the 200 barrels or even 10 barrels, they only got title to half. That rule has been set out again since the beginning of the common law. Is there some way of determining how much of this was Mexican condensate? How do you, if it's commingled and it's all mixed up, how do you determine what percentage of it might be from Mexican oil? You can't determine, you know, based on the molecule, what part, what individual specific part identified. But with fungible goods, you don't do that. What you do is you use the same rules they apply every minute of every day in Texas. Crude is commingled in pipelines and pipes and tanks every minute. No one puts oil in one end of a pipeline and gets out the exact same oil at the other end. You get a shared ownership in that fungible good. If the district court rule applied, no one could ever sue for loss of a fungible good because if a thief siphoned crude out of a pipeline or took grain out of a grain elevator owned by 100 different farmers, not a single one of those owners could trace that grain to their farm or that oil to their wellhead. According to the district court, none of them can sue the thief because they can't prove he got their oil. That's not the rule. If there's a leak, a theft, a fire, all the co-owners share in the loss. All the co-owners have a right to recover for that loss. There is not a single case cited before this court or that I've found in any state that says a victim of theft of a fungible good has to trace the identical property. The defendants continue to rely on Satterwelt, which dealt with cows, not fungible. But neither the district court nor the defendants have ever discussed how it is possible that that same court, the Amarillo Court of Appeals, 2 years later stated, There are cases in which the courts have held that no suit for conversion of personal property can be maintained unless the identical property alleged to have been converted can be identified. But that rule does not apply to this case. That was a fungible good case. Crops. The same court years later in Dorchester made the same ruling for natural gas. Your Honor, I'd like to urge this court to rule, even though it doesn't need to, on the Chapter 33 issue. Mainly because the same property law rules are affected and the analysis is the same. It's a little less important now because the defendants have admitted that if we sue to recover our condensate back, Chapter 33 does not apply. But it still gives them about a 50% drop in damages because of the gratuitous drop in the price of oil. But also, the court ruling creates the same problems for Texas property law. I think the best way to explain it is through an example. According to the defendant's new statement, if we discover that there's a rich oil man in Houston who's got a private gallery of stolen art, Chapter 33 would not apply to recovery of that art. Unless we find out that he had the gallery when the fire department's called and all the art's destroyed. In that case, the rich oil man's only going to pay a small portion of the damages because it's going to be shared between the Nazis who stole it and all the fences who got it before he got to it. Property law shouldn't depend on the remedy you seek. And besides, there's no need for the conflict. Texas law is clear. Every time there's a separate transaction in someone's property, it's a separate tort. Chapter 33 was designed to change out joint and several liability. The defendants are not jointly and severally liable. They're severally liable. Mexico has lost about $300 million of stolen condensate. They've got some money restitution that did not satisfy the amount they were claiming, the 2.4, didn't they get some money? No, that was 2.4 out of more than 30 that BSF bought. That's our position on the one satisfaction rules. That one satisfaction rule is designed entirely to prevent from getting a double recovery. The application in this case means that Pemex will receive nothing from the condensate that BSF purchased. Thank you, Your Honor. All right, thank you, Mr. Manning. You've saved time for rebuttal. Mr. Sayles. May it please the Court, I'm Travis Sayles on behalf of BASF, BASF Total Partnership, Shell Chemical, and Shell Trading, but I will also address the legal arguments for all the appellees as the questions before the Court are really legal in nature rather than factual. If the Court were to have any specific factual questions to the other appellees, most of their counsel are present and would be prepared to address such questions. Mr. Sayles, let me just start with a statement by Mr. Manning. You can evaluate it for us, give us your view. He says that under Judge Lake's opinion, no one could sue in Texas for a fungible good. Could you address that specifically? Yes, Your Honor, that's absolutely not correct. What Judge Lake did was apply very basic Texas law. This is a Texas law claim for conversion that is actually the actual claim that's brought. And what Judge Lake did is he looked and said there are two basic elements to conversion in Texas. One, the plaintiff must show and has the burden of proof to present evidence that the defendants possess wrongfully demeanor control over the plaintiff's property. And number two, with regard to liquid or fungible goods, the plaintiff must prove with evidence some quantity with reasonable certainty, not precision, but with reasonable certainty. And the entire argument in the brief submitted by PEMEX is one big assumption that Judge Lake went through thoroughly all the claims presented and said there is no evidence that these defendants bought directly from a commingled mass with an identifiable quantity of stolen Mexican condensate. The entire argument Mr. Manning just presented is based on a false strawman principle that he's saying that somehow we are contending that we have title to stolen Mexican condensate. That's not the case at all. The case was the defendants denied purchasing stolen Mexican condensate. It was the plaintiff's burden of proof in the law of conversion to come forth with evidence of that. And they also had a two-year statute of limitations under 16.003 of the Texas Civil Practice and Remedies Code, which, by the way, PEMEX agreed applied in the case below. And PEMEX agrees that the vast, vast majority of the identified transactions for each appellee occurred more than two years before they brought suit. And to avoid the obvious time bar, they came up with three incorrect arguments. One, that the discovery rule applies. Two, that the identity of the appellee must be known before the statute begins to run. And three, that somehow Mexican law trumps 16.003 and applies a different limitation period to a Texas cause of action. And briefly, we cited numerous cases of Texas Supreme Court cases and other Texas authorities that make it clear that the discovery rule does not apply to conversion of oil and gas cases. We cite the HECI 1998 Supreme Court opinion that makes that clear. The discovery rule applies only to cases in which it is inherently undiscoverable through the use of reasonable diligence. Here, Judge Lake found that the discovery rule did not apply. It's a question of law for the court, citing a number of those cases. Moreover, he said, even if the discovery rule applied, we had sent requests for admissions to PEMEX, and PEMEX admitted that it knew that its hydrocarbons were being stolen by Mexican drug cartels many years before they brought this lawsuit, more than two years before these claims, and that they were being transported across the border and then dispersed into the Texas stream of commerce. And so Judge Lake not only said that the vast majority of these claims were time-barred under the clear, unequivocal rules on statute of limitation for conversion claims, but even if the discovery rule were to apply, that the appellees had presented overwhelming evidence that PEMEX actually knew or should have known more than two years in advance, and he found that they presented no rebuttal evidence whatsoever that PEMEX exercised reasonable diligence, and in the exercise of that reasonable diligence could not have found about these claims. There were many comments by Mr. Manny, but the thrust of many of them are fraudulent concealment. So if somebody is secreting art away in a warehouse, you can allege a fraudulent concealment to keep the statute from running. But here, as to the vast majority of these appellees, PEMEX itself said these were innocent purchasers. They had no knowledge what they were buying. This is commingled supposedly goods into the pipeline. And at that point in time, they had the burden of proof to come forward with evidence. So Judge Lake, after analyzing all of this, said, and let me address the Mexican law issue. Judge Lake did a comprehensive analysis under 44.1 of PEMEX's claim that Mexican law should apply. Remember on the statute of limitations is a non-substantive procedural rule, as Judge Prado mentioned, in which a Texas court or a federal court sitting in Texas will apply the Texas rule on statute of limitations to a claim brought in Texas with the exception if a plaintiff sues under a foreign jurisdiction law that's created by a cause of action, a statute or a common law cause of action and in the body of that claim there is a specific statute of limitations that applies to that cause of action, then the Texas court or federal court sitting in Texas could apply that foreign jurisdiction statute of limitations. PEMEX does not cite a single case and there is not a case that would apply a Mexican limitations rule to a cause of action created by Texas law. And that's essentially what they did. And what Judge Lake did in this comprehensive 44.1 analysis, he found the following. Number one, that PEMEX had failed to furnish the court with clear proof of relevant foreign legal principles. Number two, that PEMEX had not cited any Mexican law that clearly recognizes a claim for illegal possession and use of sovereign Mexican property. And number three, that even if it had, PEMEX had failed to clearly prove which statute of limitations would apply, noting that in the many briefs and affidavits of the experts, they had cited two-year statute of limitations for some claims, ten-year statute and no statute, which they're now asking this court to adopt. They cite something in the Mexican Constitution, what was that language and why would that not apply? Because what it says, what they keep citing to is that it says hydrocarbons in the ground in Mexico are the inalienable and imprescriptible right of the Mexican people. Which is fine if you were trying to adversely possess Mexican hydrocarbons in Mexico, but to sue for, there's no cause of action there, Your Honor. They don't cite a theft, conversion, there's no cause of action. That's what Judge Lake found. There was no cause of action associated with that statement. And on the adverse possession front, it's not the case, there was no pleading below that they sued on adverse possession. And in fact, adverse possession, as the court would know, would be an affirmative defense if the defendants were saying, yes, we do have your product, but we held it open and obvious for such a passage of time that ownership passed to us. That's not this case at all. The briefs to this court are a bit like the old metaphor of two ships passing in the night, because what Pemex is arguing to this court was either, bears little resemblance to what was argued to Judge Lake, and little resemblance or relevance to the actual claims and motions ruled upon by Judge Lake below. After this comprehensive analysis, he said they were barred by limitations, number one. Number two, that there was no evidence to get to Judge Smith's initial question on the two essential elements. And number three, with regard to the restitution, I'll briefly address that in a moment, with regard to three specific transactions that occurred within the limitations period. And so, I think I've addressed the statute of limitations issue, but on the no evidence point, I will point that what Judge Lake did was apply very basic standard law in Texas. It didn't make it some type of haven. We've been hearing this hyperbole for a long time in the court below. A haven for drug lords and stolen artwork from around the world. What it did was apply basic law that said the two elements you have to meet show some evidence that what the defendants possessed was Mexican condensate, and number two, show with some evidence a reasonable quantity. And I think it's telling that in the first case, there's two related cases here. The first case involved BSF and some other defendants and the second case involved Shell, Marathon, Sunoco and ConocoPhillips. They actually submitted an expert report that was attached in the record to the dispositive motions in the first case. They did no expert report at all in the second, even trying to connect Mexican condensate to those defendants or estimating a quantity. But here's what their experts said in the first case. To the extent that High Sierra, which is one of these companies that they alleged blended down the line before it started selling in the marketplace, to the extent that High Sierra blended or purchased blended product, which included Mexican condensate, at this time we do not have sufficient information to determine the amount of Mexican condensate which comprises the blended product. In other words, they never said, you know, we heard this example of 50%, 50%. That was never done. There was no evidence in this record. And they cite repeatedly to the commingled mass of good cases that in which it was admitted there was no dispute in the case, the case law that they cite, that a defendant bought from a commingled mass with say a third of a stolen product in that commingled mass or a reasonable certain estimate. That's where Judge Lake said there was absolutely no evidence in this record whatsoever to get to that fact question about do these defendants possess stolen Mexican condensate? Frankly, it would be no different if Pemex sued the members of this court who went to the Shell gas station and filled up with Shell gasoline and Pemex said that Shell gasoline is derivative of condensate that Shell bought three transactions up from somebody who blended it with something that we alleged had Mexican condensate in it. They would have the burden of proof to come forward and say we actually have a chain of custody that says the person that you bought it from actually had in that blend some Mexican condensate, number one, and number two, some reasonable estimate as to what the amount is. Otherwise, it was just rank speculation and that's what Judge Lake found repeatedly in a With regard to the restitution claim that Judge Prado referenced, within the two-year statute there were three transactions in which BAS or BASF Total Partnership bought condensate from a company called Tramo and Tramo we sent a request for admission. Pemex admitted that it received from Tramo the amount of $2,415,635.72. Which was the exact amount for those three transactions and it referenced those three transactions. And Pemex has conceded, conceded to Judge Lake and conceded in its pleadings that each of these transactions they claim is a separate conversion. And so what Judge Lake said is as to those three transactions which were fully paid for and they were paid for to compensate Pemex from Tramo for those three transactions they were fully 100% reimbursed. There had been a one satisfaction, there were no damages associated with those three transactions and it would be a fraud on the court and the jury to sue BASF or BASF Total Partnership for damages for three transactions for which they had been 100% compensated. I believe I've addressed the group and if the court has any other questions I'll be glad to address those. I agree with Mr. Sales that we've been somewhat passing in the night but I think mainly that's because our arguments haven't been directly addressed. Starting with the adverse possession, we are not suing for adverse possession. What we're saying is that common law has been unchanged for centuries that limitations does not begin to run on a conversion claim. The only claim that we have in civil law that allows a party to protect their property rights. Again, Your Honor, there is none. The judge ruled, and I'll quote him, to hold any individual defendant liable for a conversion, this is what the judge ruled we had to do, PEMEX must trace condensate that was actually stolen in Mexico to the individual defendant. We did not do that. We could not do that. That is impossible when the condensate is abundant. You know that at some point some people had stolen condensate in their possession. They had, let's say, 500 average measured barrels, or I've forgotten what the measurement is, and then they sold 500 barrels to three people. So we know that three people got and then so on down the line. You don't have any evidence like that? No, we had substantial evidence. What we proved, Your Honor, is we traced every barrel of this oil across the border. And we understood because of PEMEX records that all those barrels were stolen. So we knew the stolen oil came across the border. We have stacks of customs records for each tanker. We know they went to four individuals, companies. Actually, there were five. Four of them were convicted and pled guilty to trading in stolen goods. Where the evidence fell apart, according to the judge, is people like High Sierra and Continental, who would have a huge tank as big as this room and they would dump 1,000 barrels of stolen crude and 90,000 barrels of good crude. They liked the condensate because it's light and it makes the oil not vary inexpensively because it was stolen. Then you take 100 barrels out of this mixture that's 10% stolen and 90% good. And the court said very clearly we had to trace that 100 barrels to show they actually got stolen condensate from Mexico. No, what we did and our experts did is they applied the same rules that are applied every day in the oil patch. You put in 100 barrels of stolen oil and 900 barrels of good, Pemex owned 10% of the mixture. Every barrel that came out, Pemex owned 10% of it. That's the law for fungible goods. That's what our experts said. Our experts traced it using exactly the methodology used in accounting. We did it not based on tracing the condensate from Mexico, but by tracing Pemex's ownership. So when it got mixed, we said we claimed our proportionate percentage. And it was only mixed one, Your Honor. This wasn't mixed and then put mixed and then mixed and mixed. It went to one intermediary, was mixed, and then sold. And the defendants have done a remarkable job of admitting that it was very well mixed. If it had been segregated, they always kept the condensate in one tank and the oil in another tank, then they would have an argument because then if all the condensate went to one person and they didn't buy out of that tank, it'd be okay. But no, this was all mixed together because condensate is volatile. It's really light. So you mix it with heavy crude to create something that's more saleable. You increase the value of the heavy crude. So we did show reasonable certainty of Pemex's ownership rights in the combined mass using the exact same methodology utilized by everyone in the oil industry. On the Mexican law analysis of the district court, I think it's important to note that his 44.1 analysis described by Mr. Sales was done entirely before the Mexican Attorney General issued her opinion. That was not the place. And it is true that there is not a clean claim under Mexican law. The best we could come up with was re-invictoria, actually on re-invictoria which roughly translates to a repossessory action. The claim we are bringing here is conversion. The inalienable and inscriptable nature of Pemex's condensate was not changed when it was severed. The Mexican Attorney General said that specifically. It's sovereign property. It continues its nature. And it's simply untrue although I will say that the defendant's Mexican legal expert did say that it stopped when being severed. But the Mexican Attorney General's opinion changed that. Your Honor, this is the only case that I've seen in the history of jurisprudence that cuts off an owner's rights simply because their property was taken that doesn't fit the adverse possession rules. This would be the first one. It's a bad rule. It shouldn't be allowed. Thank you. Your case and all of today's cases are under submission. Court is in recess until 9 o'clock tomorrow.